MARCUS THURMAN WADE, )
)
        Petitioner, )
)
v. )    No.    4:22-CV-043-CLC-CHS
)
WARDEN CHANCE LEEDS, )
)
        Respondent. )

## MEMORANDUM OPINION

### I.    INTRODUCTION

This matter comes before the Court upon Petitioner Marcus Thurman Wade's motion brought under 28 U.S.C. § 2254 for habeas corpus relief.

After Petitioner shot both Richard Elliott and Timothy Gill (collectively "the victims") in the head killing them, evidence at Petitioner's trial showed, among other things, that (1) Petitioner and his then-girlfriend visited the Tullahoma Quality Inn where the victims were killed on the night the victims were killed; (2) after Petitioner left her in the car at that motel, Petitioner's girlfriend heard two "pops" that sounded like fireworks; (3) Victim Elliott was found with no money on his body despite witnesses seeing him with a substantial amount of money in the hours prior to his death; (4) prior to their deaths, the victims had made controlled drug buys as police confidential informants; (5) the victims' work as confidential informants provided evidence underlying criminal prosecutions of Petitioner's nephew and others that were pending at the time the victims were shot; (6) soon before Petitioner shot the victims, at a gathering where Petitioner and his nephew were present, Petitioner reassured an individual who was being prosecuted based on the victims' work as confidential informants that everything would be okay; and (7) at the same

gathering, Petitioner's nephew stated that he had money if anything "would happen" to Victim Elliot, to which Petitioner responded, "I got you." *State v. Wade*, No. M2014-01418-CCA-R3-CD, 2016 WL 5416340, at *1–2 (Tenn. Crim. App. Sept. 28, 2016) ("*Wade I*"); *Wade v. State*, No. M2019-00716-CCA-R3-PC, 2021 WL 1886189, at *1 (Tenn. Crim. App. May 11, 2021) ("*Wade II*"). Based on this evidence, a jury convicted Petitioner of murdering both victims and the especially aggravated robbery of Victim Elliott. *Wade I*, 2016 WL 5416340 at *7.

Petitioner, a state prisoner acting pro se, seeks relief under § 2254 from these convictions based on (1) six claims for ineffective assistance of counsel [Doc. 1 at 5–14]; and (2) one claim that the evidence was insufficient to support his indictment and convictions [*Id.* at 14]. Respondent filed a response in opposition to the petition [Doc. 14] and the state court record [Docs. 10, 11, 12, 16]. Petitioner did not file a reply, and his time for doing so has passed [Doc. 9 at 1].

After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to relief under § 2254. Accordingly, the Court will not hold an evidentiary hearing, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the habeas corpus petition will be **DENIED**, and this action will be **DISMISSED**.

## II.     BACKGROUND[1]

Testimony at Petitioner's trial indicated that on October 30, 2010, Ron and Sharon Nixon discovered the victims' dead bodies in a Tullahoma Quality Inn room that contained no firearms and showed no sign of a struggle. *Wade I*, 2016 WL 5416340 at *1. The lack of any evidence of a struggle in the motel room led police to believe the shooter either had a key to the room or knew

---

[1] The Court has reviewed the entirety of the extensive state court record Respondent filed [Docs. 10, 11, 12, 16]. Nevertheless, the Court summarizes the relevant background facts for Petitioner's claims in this action by citing the Tennessee Criminal Court of Appeals' (TCCA) opinions in *Wade I* and *Wade II*, as Petitioner does not dispute the TCCA's recitations of facts from those opinions.

2

the victims.  *Id.*  When police examined the victims' bodies, Victim Elliott had no money on him, and Victim Gill had thirteen dollars.  *Id.*

In the months leading up to the victims' deaths, Ron Nixon "front[ed]" Victim Elliott approximately $44,000 because Victim Elliott told Ron Nixon that he had inherited money and would pay Ron Nixon back when the legal proceeding regarding that inheritance concluded.  *Id.* As a part of this agreement, Ron Nixon paid for the Tullahoma Quality Inn room where the victims were found dead.  *Id.*

In the morning hours of October 30, prior to Ron and Sharon Nixon's discovery of the victims' bodies, Ron and Sharon Nixon went to a credit union where they were supposed to meet with Victim Elliot to complete a real estate transaction that would repay Ron Nixon a large portion of the money he had provided Victim Elliot.  *Id.* at *2.  After Victim Elliot did not show up for this appointment, Ron and Sharon Nixon drove by both victims' houses before eventually heading to the Tullahoma Quality Inn, where they found Victim Elliott's car in the parking lot.  *Id.*  Mr. Nixon obtained a key to the room where the victims were staying, and he and Sharon then discovered the victims' dead bodies, at which point Mrs. Nixon called police.  *Id.*

Toxicology tests on the victims were positive for alcohol and cocaine.  *Id.*  Also, during their investigation into the shooting, police learned that in the months leading up to the shooting, the victims had set up controlled drug buys as confidential informants for the Winchester Police Department.  *Id.*  These controlled buys led to felony drug indictments against various people, including Petitioner's nephew, Anthony Hill.  *Id.*

Testimony at Petitioner's trial also indicated that around 7:40 p.m. on October 29, the victims had successfully arranged to obtain crack cocaine from Petitioner at Victim Gill's aunt's house.  *Id.*  While the victims were at her house, Victim Gill's aunt saw Victim Elliott with "a

bundle of money." *Id.* Also, after the victims' bodies were found, Victim Gill's aunt called Petitioner and asked him if he had "bother[ed] her family," to which Petitioner responded that he had not gone to Tullahoma, even though Victim Gill's aunt had not mentioned Tullahoma. *Id.*

Additional testimony at Petitioner's trial indicated that around 10:00 or 11:00 p.m. on October 29, the victims had visited Victim Elliott's son's house. *Id.* at \*3. During this visit, Victim Elliott showed his son that he had twenty-one thousand dollars in cash, and Victim Elliott's son heard Victim Elliott giving directions to Tullahoma to someone on the phone. *Id.*

Tullahoma Quality Inn surveillance video showed that at 11:38 p.m. on October 29, Victim Elliot reactivated his room key. *Id.*

Other evidence at Petitioner's trial showed that Petitioner and Victim Elliott contacted each other 22 times between 7:45 p.m. on October 29 and 12:27 a.m. on October 30. *Id.* When the last call between Petitioner and Victim Elliott occurred, their phones were using the same cellular tower. *Id.* Also, at 12:53 a.m. on October 30, Petitioner made a phone call to his nephew, Anthony Hill. *Id.*

Casey Tarrant, who also faced criminal prosecution due to the victims' controlled buys as confidential informants, testified that on October 29, he was with Petitioner and Petitioner's nephew, Anthony Hill, at Rontye Gray's house. *Id.* At this gathering, Mr. Tarrant expressed concern about his pending criminal prosecution, and Petitioner assured him that everything was going to be okay. *Id.* Also during this gathering, Petitioner's nephew, Anthony Hill, stated that "he had money for—if something would happen to" Victim Elliott, to which Petitioner responded, "I got you." *Id.*

During their investigation of Petitioner, police interviewed Petitioner's then-girlfriend Timica Jones, who was not "very forthcoming" at first but ultimately stated that she and Petitioner

4

went to the Tullahoma Quality Inn on the night of the shooting of the victims.  *Id.*  Ms. Jones also told officers Petitioner then "discarded a gun at the side of a road near the top of Sewanee Mountain."  *Id.*  Officers took Ms. Jones with them to search for the gun in this area, but they did not find it.  *Id.*

At Petitioner's trial, Ms. Jones testified that on October 29, she and Petitioner rode around in a car together, and at one point, Petitioner sold crack cocaine to a man who was accompanied by another man.  *Id.* at *4.  She and Petitioner also went to a Walmart, where Petitioner bought a "pay-as-you-go" cell phone.  *Id.*  After various other stops, Petitioner and Ms. Jones went to the Tullahoma Quality Inn.  *Id.*  At the motel, Petitioner got out of the car, and Ms. Jones stayed in the car.  *Id.*  Earlier that evening, Ms. Jones had seen that Petitioner had a gun, which she "knew he routinely carried," and she thought Petitioner had the gun with him when left the car.  *Id.*  While Petitioner was outside the car, "Ms. Jones heard two distant 'pops' that sounded like fireworks. She looked around but saw nothing."  *Id.*

According to Ms. Jones, Petitioner returned to the car with an item that appeared to be a "touchscreen" cell phone, and he also seemed to put an item in a bag in the back seat after entering the car.  *Id.*  Petitioner and Ms. Jones then went to Petitioner's mother's house, where they saw Petitioner's nephew, Anthony Hill, driving away.  *Id.*  Petitioner waved to Mr. Hill but did not speak to him.  *Id.*  Petitioner entered his mother's house with the plastic bag, which he also brought back to the car after exiting the house.  *Id.*  After leaving Petitioner's mother's house, Petitioner and Ms. Jones "drove toward Cowan."  *Id.*  Ms. Jones did not see the cell phone from the hotel room again but knew that Petitioner "threw it away as they drove past North Lake Elementary School."  *Id.*

5

Ms. Jones testified that police stopped Petitioner for speeding in Cowan. *Id.* During this stop, Petitioner reached into the back seat, at which point Ms. Jones heard a bag rattling in the back seat. *Id.* Petitioner then drove up Sewanee Mountain and threw a bag out of the car window. *Id.* "Ms. Jones did not see what was in the bag." *Id.* Petitioner and Ms. Jones then went to Monteagle, where Petitioner "asked Ms. Jones to rent a motel room [in Monteagle] in her name and gave her cash to pay for the room." *Id.* After leaving Monteagle, Petitioner and Ms. Jones stopped in Chattanooga and South Pittsburg before going home. *Id.* "The police verified the route Ms. Jones and [Petitioner] took on the night of October 29 and on October 30 by examining their cellular telephone records." *Id.*

The next day, Ms. Jones saw a report about a murder in a motel room in Tullahoma on the television news. *Id.* at *5. Ms. Jones recognized that one of the victims was the man she had seen buy cocaine from Petitioner on October 29. *Id.* Ms. Jones also "told her mother that she and [Petitioner] had been at that motel the previous night. *Id.* Ms. Jones "started putting 2 and 2 together . . . and . . . freaking out." *Id.* When Ms. Jones called Petitioner about the news report, he "told [her] to shut up, he didn't want to hear it and not to speak of it again, and if [she] did, [she] would come up missing. Ms. Jones did not call the police because she was afraid." *Id.*

Officer Jason Kennedy testified that on February 15, 2011, he and Agent Kendall Barham interviewed Petitioner, who was cooperative, about the killing of the victims after they read him his *Miranda* rights. *Id.* In this interview, Petitioner said that he did not know the victims and would not recognize them from a photograph but then "referred to Mr. Gill as 'the bigger one.'" *Id.* Petitioner further stated that on October 29, he was with Ms. Jones and a police officer stopped them in in Cowan, which was where Petitioner claimed he was that whole night. *Id.* Petitioner also "denied knowing before the victims' deaths that they were responsible for 'setting up' Mr.

6

Hill" but admitted that "he sold crack cocaine and . . . may have sold crack cocaine to Mr. Elliott through Viola Stephens, who was Mr. Gill's aunt." *Id.*

Subsequently, on February 25, 2011, various law enforcement officers rode together to transfer Petitioner to Chattanooga from Winchester after an officer again advised Petitioner of his *Miranda* rights. *Id.* During this ride, an officer told Petitioner that police knew about his "movements before, during, and after the murders." *Id.* When an officer said that Petitioner had been at Mr. Gray's house with his nephew, Anthony Hill, Mr. Tarrant, and others, Petitioner nodded in a way that "acknowledge[ed] that he had been at Mr. Gray's residence." *Id.* Petitioner also nodded affirmatively after an officer stated that Petitioner had "sold crack cocaine to Mr. Elliott in the afternoon before the murders." *Id.* Petitioner further agreed that he "ate a hamburger at Sonic, bought a new cellular telephone at Walmart, and that he and Ms. Jones drove his mother's vehicle to the Quality Inn." *Id.* The officer then told Petitioner that police knew he "threw a cellular telephone and a gun out the window of the vehicle as he was driving from Tullahoma, . . . [and drove] through Winchester and Cowan, up Sewanee Mountain, and [] stop[ped] at a nursing home in South Pittsburg . . . and that the victims were shot." *Id.* After these statements, "[Petitioner] said, 'Yeah,' and nodded his head." *Id.*

An officer also asked Petitioner "if he had killed the victims to avenge a relative or just to rob them," at which point Petitioner's "eyes filled up with tears, and he nodded his head forward twice, acknowledging that the reason he had killed them was to avenge a relative." *Id.* An officer also "noted that Petitioner 'had previously said he would never hurt anyone unless they had harmed his family' and asked if the Appellant had killed the victims to protect Mr. Hill," and Petitioner again "nodded his head forward, acknowledging that was why he had killed them." *Id.* Another

officer "said the police had heard that Mr. Fuqua and Mr. Hill each paid the Appellant $2,500 to kill the victims," and Petitioner responded that he did not get paid.  *Id.* at *6.

An officer then told Petitioner that he understood Petitioner protecting his nephew but did not understand Petitioner protecting Mr. Fuqua, who was not his relative, and Petitioner responded that he would take care of it when he got out.  *Id.*  After an officer asked Petitioner for details of the murders, Petitioner requested an attorney and "pronounced that anyone that he had ever laid hands on is still walking and that he had not killed anyone."  *Id.*

Kimberly Eddings also testified that two weeks before the murders, she went with Petitioner and Ernie May to the Tullahoma Quality Inn, where they saw a white minivan in the parking lot.  *Id.*  "[Petitioner] said that 'he was going to hit a lick,' which Ms. Eddings thought meant he intended to rob someone."  *Id.*  "[Petitioner] and Mr. May put on gloves, got a knife, exited the car, and walked upstairs to a motel room," while "Ms. Eddings stayed in the car."  *Id.*

Victim Elliott's wife testified at Petitioner's trial that on one occasion, she and her niece were in Victim Elliott's room at the Tullahoma Quality Inn when she heard a knock.  *Id.*  She opened the door, and Mr. May and Petitioner asked where Victim Elliot was.  *Id.*  "Mrs. Elliott responded that he was not in the room and that they could return later."  *Id.*

An inmate serving a federal prison sentence also testified at Petitioner's trial that in November 2011, he and Petitioner shared a cell, and Petitioner "told [the inmate] that he went to a hotel room and shot two people who were confidential informants . . . [and] that a female was waiting for him in the car and that he drove away after the shooting."  *Id.*  Petitioner also told the inmate "that he did it for somebody else, one of his family members and all of that," and the inmate said that family member was named "A. Hill or something like that, Andrew Hill or something, A. Hill something."  *Id.*

8

A different inmate also serving a federal prison sentence testified that he had known Petitioner for a long time and that after Halloween 2010, Petitioner told him, "Man, me and Mica was going through so much. I should have knocked her off, too." *Id.* When the inmate asked, "For what?," Petitioner said, "Because she was there when I murdered those white guys." *Id.* Petitioner further stated, "that he shot the two white men in the head and "made it look like it was suicide." *Id.* In one statement this witness gave authorities, he reported that Petitioner specifically noted "that the shooting occurred at a hotel in Manchester." *Id* at *7.

Victim Elliott's brother testified that he went to the Tullahoma Quality Inn around 10:00 or 10:30 a.m. on October 30, at which point he learned that Mr. Nixon had found the victims, and "Mr. Nixon told Terry Elliott that he went through Mr. Elliott's pockets before the police arrived, looking for Mr. Elliott's mother's telephone number." *Id.*

Ellen Meeks testified that Victim Elliott was a drug addict who "partied a lot and drank." *Id.* She also said that Victim Elliott often came into the store where she worked to cash checks, many of which were for $500 or more and from Mr. Nixon. *Id.* This witness also said that in the months before Victim Elliott died, such visits were more frequent, and on one occasion, she saw Victim Elliott and Ray Nixon, Mr. Nixon's son, together, and that Ray Nixon "was upset and angry that his father gave money to [Victim] Elliott but would not give any money to him." *Id.*

A manager of the Tullahoma Quality Inn testified that although other guests were staying in the same wing of the motel as the victims on October 29, no guest made a noise complaint. *Id.*

After hearing all the evidence, the jury found Petitioner guilty of first-degree premeditated murder of both victims, felony murder of both victims, and especially aggravated robbery of Victim Elliott. *Id.* "The trial court merged the first-degree premeditated murder convictions and the felony murder convictions into a single conviction for each victim." *Id.*

Petitioner filed a direct appeal challenging his convictions, the Tennessee Court of Criminal Appeals ("TCCA") affirmed them, *Wade I*, and the Tennessee Supreme Court ("TSC") declined review [Doc. 11–29].

Petitioner then filed a pro se petition for post-conviction relief raising various claims for ineffective assistance of counsel [Doc. 12-1 at 3–10] and an amended petition [*Id.* at 20–30]. His counsel later subsequently filed numerous additional claims for post-conviction relief [*Id.* 35–39, 42–43, 45, 47, 52–53]. In all his substantive post-conviction filings, Petitioner's post-conviction counsel specified that he was supplementing the previous post-conviction filings [*Id.* at 35, 42, 45, 47, 52].

The post-conviction court held a hearing on the post-conviction petition [Doc. 12–2]. At the post-conviction hearing, Petitioner testified in relevant part that he had used drugs since the age of eleven, and that this drug use had negatively affected his ability to understand things, his ability to get a job, and his daily decisions. *Wade II*, 2021 WL 1886189 at *9. Petitioner also stated that he completed the eleventh grade after being held back "a couple of times" and that "[a]cademics was not [his] thing." *Id.* Petitioner further testified that he "was willing to testify at the suppression hearing that he was under the influence of drugs during the February 15 interview and was unable to make an intelligent decision regarding whether to proceed with the interview." *Id.*

Petitioner additionally testified "that he was a black man and that no black people served on the jury which convicted him." *Id.*

According to Petitioner, in the months prior to the victims' deaths, he was the only one who would sell the victims drugs "because they were known confidential informants," and he had therefore made a substantial amount of money doing so but was not "buddy buddy" with the

10

victims. *Id.* Petitioner admitted to selling the victims drugs on various occasions in the days prior to their deaths. *Id.* Petitioner further noted that for some of those sales, he met the victims "in a rural area" and "the victims were not reluctant to meet him in secluded areas." *Id.*

Petitioner's trial counsel testified that he thought Petitioner was "much more sophisticated in the criminal process" than Petitioner had represented himself to be in his post-conviction testimony. *Id.* at *10. Trial counsel also testified that he "often thought [] Petitioner 'was the smartest person in the room'" and that Petitioner "never gave [counsel] any indication that he had any mental deficiency issue that could be exploited." *Id.* Trial counsel further stated that he reviewed the recording of the February 15 interview and did not believe it supported a claim that Petitioner had any mental health issues because Petitioner displayed a "relaxed demeanor," and nothing indicated Petitioner was under any pressure. *Id.* at 11. Accordingly, trial counsel only pursued suppression of the interview based on *Miranda* at trial and in the direct appeal. *Id*. at *11.

After the hearing, Petitioner's counsel filed a brief addressing some of Petitioner's claims for post-conviction relief [Doc. 12–1 at 61–68]. In this brief, Petitioner's post-conviction counsel specifically noted that while this filing addressed only some of Petitioner's claims, it did not waive any claims from other pleadings [*Id.* at 61].

The post-conviction court denied Petitioner relief [Doc. 12–1 at 69–75], the TCCA affirmed, *Wade II*, and the TSC denied review [Doc. 12–39]. Petitioner then filed the instant petition for relief under § 2254 [Doc. 1].

## III.    STANDARD OF REVIEW

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a federal court to grant habeas corpus relief on any claim adjudicated on the merits in a state court only where that adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established"

11

United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

This Court may grant habeas corpus relief under the "contrary to" clause where the state court (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." (citing *Williams*, 529 U.S. at 410)). Rather, this Court may grant relief for a claim the state court decided on its merits only where the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Also, before a federal court may grant habeas corpus relief, the petitioner must have first exhausted his available state remedies for the claim. 28 U.S.C. §2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 302–03 (1984)). Fair presentation means that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971). "It is not enough that all the facts

12

necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the same claim under the same theory" to the state and the federal courts. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding a constitutional claim must be presented in federal court under the same theory as presented in state appellate process). Tennessee has determined that presentation of a claim to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39.

If a prisoner never presented a claim to the highest available state court and a state procedural rule now bars presentation of the claim, the petitioner procedurally defaulted that claim. *Coleman v. Thompson*, 501 U.S. 722, 731–32, 750 (1991). In such circumstances, the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161 (1996); *Coleman*, 501 U.S. at 732; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted."). Tennessee petitioners may generally proceed through only one full round of the post-conviction process, and Tennessee imposes a one-year statute of limitation on such actions. Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule).

A federal district court may review a procedurally defaulted habeas corpus claim only where the petitioner shows cause for his default and actual resulting prejudice, "or . . . that failure to consider the claim[] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749–50. Errors of post-conviction counsel generally are not "cause" to excuse a procedural default. *Id.* at 752–53. But the Supreme Court established an equitable exception to this rule in *Martinez v. Ryan*, holding that the inadequate assistance of post-conviction counsel or the

13

absence of such counsel may establish cause for a prisoner's procedural default of an ineffective assistance of trial counsel claim under certain circumstances. *Martinez v. Ryan*, 566 U.S. 1, 9, 17 (2012).

However, The *Martinez* exception does not apply to a claim of ineffective assistance of trial counsel that a petitioner raised in the initial-review collateral stages and defaulted on appeal. *See*, *e.g.*, *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1136 (6th Cir. 2016) (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals"). And *Martinez* does not excuse a petitioner's failure to develop a factual record for a claim, even where he attributes that failure to the ineffective assistance of his post-conviction counsel. *Shinn v. Ramirez*, 596 U.S. 366, 383–384 (2022).

## IV. ANALYSIS

The Court will address Petitioner's ineffective assistance of counsel claims before addressing his claim that the evidence was insufficient to support his convictions.

### A. Ineffective Assistance of Counsel Claims

In his § 2254 petition, Petitioner brings six ineffective assistance of counsel claims, which the Court summarizes as follows:

(1) Trial counsel was ineffective for waiving Petitioner's preliminary hearing, which Petitioner claims allowed him "to be indicted and prosecuted on insufficient evidence" [Doc. 1 at 5];

(2) Trial counsel was ineffective for "fail[ing] to challenge the jury selection process," where Petitioner, an African American man, was accused of killing two white men, and all of the individuals selected for Petitioner's jury were white [*Id.* at 7];

(3) Trial counsel was ineffective for failing to ask questions about racial bias during voir dire [*Id.* at 8];

14

(4)     Trial counsel was ineffective for failing to have Petitioner subjected to a psychological examination [*Id.* at 10];

(5)     Trial counsel was ineffective for failing to obtain funds for independent experts regarding the victims' body temperatures and the cell phone evidence [*Id.* at 14]; and

(6)     Trial counsel was ineffective for failing to present mitigating evidence at his sentencing [*Id.*].

The Court will address whether Petitioner properly exhausted these claims with the state courts and whether the Court may excuse any procedural default of these claims before setting forth the standard of review and addressing the claims that are properly before the Court.

### 1.     Exhaustion

Petitioner raised all six of the ineffective assistance of counsel claims he seeks to bring herein under § 2254 in his initial and amended pro se petitions for state post-conviction relief [Doc. 12–1 at 3–12, 20–30].  And, as set forth above, Petitioner's counsel's subsequent post-conviction filings specified that those filings only supplemented the prior post-conviction petitions [*Id.* at 35, 42, 45, 47, 52, 61].  Nevertheless, the post-conviction court only addressed the claims raised in Petitioner's counsel's filings, which included the ineffective assistance of counsel claims numbered (2) and (4) above but did not include ineffective assistance of counsel claims numbered (1), (3), (5), and (6) above, in its written opinion denying the petition [*Id.* at 69–75].

As such, Petitioner's post-conviction filings demonstrate that his post-conviction counsel did not abandon any of the ineffective assistance of counsel claims Petitioner seeks to bring in his § 2254 petition during the initial post-conviction proceeding, and that the post-conviction court could have addressed all those ineffective assistance of counsel claims on the merit in its written opinion.  Accordingly, the Court must presume that the post-conviction court denied all of Petitioner's ineffective assistance of counsel claims from his § 2254 petition on the

15

merits. *Johnson v. Williams*, 568 U.S. 289, 293 (2013) (providing that "when a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was denied on the merits").

Additionally, as Tennessee law allowed Petitioner to raise all of his ineffective assistance of counsel claims from his post-conviction filings in his appeal of the denial of his post-conviction petition to the TCCA, but Petitioner only raised claims (2) and (4) from his § 2254 petition in that appeal, the record establishes that Petitioner's procedural default of his ineffective assistance of counsel claims numbered (1), (3), (5), and (6) above occurred on appeal, and that *Martinez* therefore cannot excuse that default. *Garrett v. State*, 2012 WL 3834898, at *17 (Tenn. Crim. App. Sep. 5, 2012) (finding in relevant part that where (1) the petitioner had raised a claim in a pro se petition; (2) the amended petition that the post-conviction court addressed on the merits incorporated the earlier pro se petition; and (3) the post-conviction court's written opinion did not address the claim from the pro se petition, the post-conviction petitioner had not waived the claim from the pro se petition that the post-conviction court did not address on the merits in its written opinion for purposes of his TCCA appeal); *Middlebrooks*, 843 F.3d at 1136 (stating that *Martinez* did not apply "because those claims were raised and rejected on the merits by the initial postconviction court, and ineffective assistance of counsel on post-conviction appeal cannot establish 'cause' to excuse [petitioner]'s procedural default, which occurred only in the Tennessee Court of Criminal Appeals").

The Court further notes that, in his petition, Petitioner does not allege or set forth any facts indicating that the ineffective assistance of his post-conviction counsel caused his default of the ineffective assistance of counsel claims that he raises in his petition for § 2254 relief but did not raise in his appeal of the denial of his post-conviction petition. As such, he has not set forth any

cause for the Court to excuse his procedural default of these claims. *Hugueley v. Mays*, 964 F.3d 489, 498–99 (6th Cir. 2020) (providing that a petitioner relying on the *Martinez* exception "must still demonstrate that the ineffectiveness of his post-conviction counsel was the 'cause' of his default" (quoting *Trevino*, 569 U.S. at 423)).

Thus, Petitioner procedurally defaulted his ineffective assistance of counsel claims numbered (1), (3), (5), and (6) above, and he has not shown cause for the Court to excuse that procedural default. As such, these claims are **DENIED** on this ground.

The Court will now address Petitioner's two exhausted ineffective assistance of counsel claims.

### 2. Standard of Review

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This includes the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687. A petitioner has the burden of proving ineffective assistance of his counsel. *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011) (citing *Strickland*, 466 U.S. at 687–688).

In considering the first prong of *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A party asserting an ineffective-assistance-of-counsel claim must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires a claimant to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

The Supreme Court has emphasized that a claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and if either prong is not satisfied, the claim must be rejected. *Strickland*, 466 U.S. at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the "doubly deferential" review of such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### 3. Jury Selection Process

Petitioner's first ineffective assistance claim that the Court will address on the merits is that his counsel was ineffective for "fail[ing] to challenge the jury selection process," where Petitioner, an African American man, was accused of killing two white men, and all members of the jury selected for his trial were white [Doc. 1 at 7].

Under the Sixth Amendment, criminal defendants have "the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559

18

U.S. 314, 319 (2010) (citing *Taylor v. Louisiana,* 419 U.S. 522 (1975)). A party asserting a violation of this right must demonstrate: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id.* (quoting *Duren v. Missouri,* 439 U.S. 357, 364 (1979)).

Petitioner raised this claim in his appeal of the denial of his post-conviction petition [Doc. 12–29 at 34–35]. The TCCA addressed it in relevant part as follows:

> The Petitioner contends that trial counsel was ineffective for failing to challenge the racial composition of the jury venire.
>
> &ast; &ast; &ast;
>
> A defendant is constitutionally entitled to a jury that is drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527–28 (1975). Regardless, a defendant is "not entitled to a jury of any particular composition because the fair cross-section requirement does not impose a requirement that the jury actually chosen mirror the community or reflect the various distinctive groups in the population." *State v. Hester*, 324 S.W.3d 1, 39 (Tenn. 2010). In determining whether a jury was properly selected from a fair cross-section of the community, we utilize the three-pronged test set forth in *Duren v. Missouri*, 439 U.S. 357, 364 (1979), which states that the Petitioner must show:
>
>> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;
>> (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.
>
> *State v. Mann*, 959 S.W.2d 503, 535 (Tenn. 1997) (citing *Duren*, 439 U.S. at 363) (footnote omitted).
>
> We note that the post-conviction court found that "trial counsel indicated that this issue was considered and that he felt the venire represented the overall population breakdown of Coffee County." We have examined trial counsel's testimony at the post-conviction hearing and can find no such testimony. Nevertheless, although

19

"the Petitioner has alleged the exclusion of a distinctive group based on race, he has not alleged any sort of systematic exclusion." *Josh L. Bowman v. State*, No. E2016-01028-CCA-R3-PC, 2017 WL 1449232, at *8 (Tenn. Crim. App. Apr. 24, 2017) (citations omitted). The Petitioner's only proof on this issue was his testimony that he was black and that no black people served on his jury. "[A]lthough the Petitioner . . . testified regarding how many African Americans were on the panel, no proof was introduced regarding what percentage of the community was African American." *Id.* (citing *State v. Stephens*, 264 S.W.3d 719, 733 (Tenn. Crim. App. 2007)). Accordingly, the Petitioner has failed to establish any deficiency by trial counsel or that he suffered any prejudice by the alleged deficiency.

*Wade II*, 2021 WL 1886189 at *15.

Petitioner has not alleged or established that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. And the Court has found no evidence in the record to support finding that Petitioner's counsel acted deficiently with regard to this issue, or that trial counsel's failure to raise this issue prejudiced Petitioner.

Specifically, as the TCCA correctly noted, Petitioner has never set forth any proof that the racial composition of the jury selected for his trial was unfair and unreasonable based on the community's population, or that any lack of a more racially diverse jury was due to systematic exclusion of African Americans from the jury selection process. Without such proof, the Court cannot say that Petitioner's counsel acted deficiently by not raising this argument, or that Petitioner's counsel's failure to raise this argument prejudiced Petitioner, as there is nothing in the record to suggest that this argument had any merit or would have been successful.

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### 4. Psychological Evaluation

Petitioner next claims that his trial counsel was ineffective for not subjecting him to a psychological evaluation [Doc. 1 at 5]. The TCCA addressed this claim as follows:

> The Petitioner contends that trial counsel was ineffective by failing [to] have the Petitioner psychologically evaluated. The Petitioner asserts that "[d]uring a key interview, he was under the influence of drugs," that the Petitioner's use of drugs was extensive, and that the Petitioner was unable to graduate from high school. The Petitioner asserts that his history of drug use negatively impacted his ability to make decisions and that he was therefore "unfit for trial." The Petitioner argues that the result of the trial would have been different if he had been psychologically evaluated.
>
> The Petitioner recognizes that his argument is "somewhat weak," but he maintains that he cannot strengthen his position through expert testimony because he is indigent and the State will not approve funding for an expert in non-capital post-conviction cases. The Petitioner maintains that the failure to provide funding for expert witnesses in non-capital post-conviction cases "violates the Equal Protection Clause of the United States Constitution and the Law of the Land Clause of the Tennessee Constitution."
>
> The record does not contain any evidence that the Petitioner requested, and was denied, funds for an expert witness. *See* Tenn. R. App. P. 36(a); *see also* Tenn. R. App. P. 24(b). Additionally, he did not contend in the post-conviction court that his constitutional rights were violated by the rules denying funding for an expert witness. *See Joseph Cordell Brewer, III v. State*, No. W2016-02106-CCA-R3-PC, 2018 WL 446686, at *3–4 (Tenn. Crim. App. at Jackson, Jan. 16, 2018). Therefore, the Petitioner has arguably wa[i]ved this issue.
>
> In any event, our supreme court has held that an indigent petitioner is not entitled to state funds for an expert in a petition for post-conviction relief in a non-capital case. *Davis v. State*, 912 S.W.2d 689, 696–97 (Tenn. 1995). This court is bound by the decisions of the Tennessee Supreme Court. *Wesley Jones v. State*, No. W2015-01481-CCA-R3-PC, 2016 WL 4357422, at *22 (Tenn. Crim. App. at Jackson, Aug. 11, 2016).

*Wade II*, 2021 WL 1886189 at *13–14.

Petitioner has not alleged or established that the TCCA's denial of this claim was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. And the record does not support such a finding. To the contrary, the record supports the TCCA's denial of this claim.

21

Specifically, to the extent Petitioner asserts that a psychological evaluation would have demonstrated that he was incapable of consenting to the February 15 interview due to his drug usage, the Court notes Petitioner's counsel testified that he reviewed the footage of this interview and determined a "diminished capacity" argument regarding this interview would not benefit the defense due to Petitioner's "relaxed demeanor" and the lack of any indication that Petitioner was under pressure during the interview. *Wade II*, 2021 WL 1886189 at *11. Petitioner's counsel therefore decided to challenge the interview only on *Miranda* grounds. *Id.* Petitioner has not pointed to, nor has the Court observed, anything in the record that suggests this decision was unreasonable. To the contrary, the Court has reviewed the recording of the February 15 interview and finds (1) the conversation between Petitioner and the officers was generally jovial; (2) Petitioner's demeanor during that conversation was relaxed and friendly; and (3) nothing in the interview suggested Petitioner was unwilling or unable to voluntarily participate therein.

Thus, the record demonstrates Petitioner's counsel made a reasonable strategic decision to challenge the admissibility of this interview based only on *Miranda*, rather than asserting that it was inadmissible based on Petitioner's diminished capacity. *Strickland*, 466 U.S. at 690–91 (noting that counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). The fact that this strategy was unsuccessful does not make it unreasonable. *Id.*

The Court further finds Petitioner has not established, nor does the record support finding, that if the trial court had suppressed the recording of the February 15 interview, the result of Petitioner's trial would have been different, such that Petitioner could show

that his trial counsel's failure to seek suppression of the recording based on a diminished capacity argument prejudiced him. To the contrary, the Court finds the record from Petitioner's trial demonstrates that other substantial proof of Petitioner's guilt supported the jury finding him guilty of the murders of the victims and the especially aggravated robbery of Victim Elliott. In other words, this was not a close case where the recording of the February 15 interview, in which Petitioner did not confess to any crimes, may have swayed the jury from its decision to convict Petitioner.

Further, to the extent Petitioner argues that his counsel was ineffective for failing to obtain a psychological examination for him because such an examination could have resulted in expert testimony that he did not have the requisite intent to commit the murders of the victims and/or the especially aggravated robbery of Victim Elliott, Petitioner does not cite, nor has the Court located, any evidence in the record indicating that, at the time that Petitioner committed those offenses, he suffered from a mental condition that prevented him from being able "to form the requisite culpable mental state to commit the offenses," such that Tennessee law would have permitted expert testimony regarding any diminished mental capacity at trial. *State v. Hall*, 958 S.W.2d 679, 689, 690 (Tenn. 1997) (providing that under Tennessee law, expert testimony regarding a defendant's mental state is only admissible where it establishes "that the defendant lacks the capacity, because of a mental disease or defect, to form the requisite culpable mental state to commit the offenses" and that expert evidence regarding a defendant's mental state "should not be offered as proof of 'diminished capacity'" or "a particular emotional state or mental condition" but only "to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried."). As such, the Court cannot find that

23

Petitioner's counsel was deficient for not attempting to obtain an expert to provide such testimony, or that counsel's failure to attempt to obtain such an expert prejudiced Petitioner in a manner that would entitle him to relief under *Strickland*.

Accordingly, Petitioner is not entitled to relief under § 2254 for this claim.

### B. Sufficiency of the Evidence

Petitioner also challenges the sufficiency of the evidence to support his convictions[2] [Doc. 1 at 14]. The United States Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307 (1979) provides the controlling rule for this claim. *See Gall v. Parker*, 231 F.3d 265, 287–88 (6th Cir. 2000), *superseded by statute on other grounds, as recognized in Parker v. Matthews*, 567 U.S. 37 (2012). In *Jackson*, the Supreme Court held that the evidence is sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. In determining whether the evidence meets this standard, the district court may not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

Also, a federal habeas court reviewing the sufficiency of the evidence must apply two levels of deference. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). First, under *Jackson*, the court gives deference to the verdict "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)

---

[2] In his petition, Petitioner states that he also challenges the sufficiency of the evidence to support the indictment against him [Doc. 1 at 14]. However, as the only substantively similar claim Petitioner presented to the TCCA challenged the sufficiency of the evidence at his trial [Doc. 11-11 at 26–33], this is the only claim the Court will address on the merits. *Wagner*, 581 F.3d at 418 (finding a constitutional claim must be presented in federal court under the same theory as presented in state appellate process).

24

(citing *Jackson*, 443 U.S. at 324 n.16); *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (providing that "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution'") (quoting *Jackson*, 443 U.S. at 326). The habeas court must give additional deference to the state court's consideration of the verdict under the AEDPA's highly deferential standards. *Cavazos*, 565 U.S. at 7 (noting the double deference owed "to state court decisions required by § 2254(d)" and "to the state court's already deferential review"). As such, a petitioner challenging the evidence against him "bears a heavy burden." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986).

The TCCA addressed Petitioner's claim in his direct appeal that the evidence was insufficient to support his convictions as follows:

> Finally, the Appellant challenges the sufficiency of the evidence sustaining his convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).
>
> Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).
>
> The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that

25

evidence is the same whether the conviction is based upon direct or circumstantial evidence.  *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed the "premeditated and intentional killing of [the victim]."  Tenn. Code Ann. § 39-13-202(a)(1).  Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself.  [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."  *Id.* at (d).  Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation.  *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).  Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing.  *See Pike*, 978 S.W.2d at 914-915; *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery."  Tenn. Code Ann. § 39-13-202(a)(2).  Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury.  Tenn. Code Ann. § 39-13-403(a)(1) and (2).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a).  A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent.  Tenn. Code Ann. § 39-14-103.  Serious bodily injury is defined as a bodily injury that involves a substantial risk of death.  Tenn. Code Ann. § 39-11-106(a)(34)(A).

The Appellant's challenge to the sufficiency of the evidence of his convictions largely concerns the credibility of the State's witnesses.  Specifically, the Appellant contends that in Timica Jones's initial statement, she told the police that the Appellant did not have a gun on the night in question; however, she testified at trial that he did have a gun.  The Appellant also contends that Mr. Tarrant testified that the Appellant was driving a silver van when he met with Mr. Hill at Mr. Gray's residence prior to the shooting but that the proof at trial revealed that the Appellant rented a maroon van after the shooting.  However, determining the credibility of witnesses is within the purview of the jury.  *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of

fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000).

In the light most favorable to the State, the proof adduced at trial revealed that as a result of the victims' work as confidential informants, the Appellant's nephew was indicted for a felony drug offense. On October 29, the Appellant was at Mr. Gray's house with his nephew and Mr. Tarrant, who were concerned about going to prison. The Appellant told them, "'Don't worry about it. Everything is going to be all right.'" Mr. Hill said that "he had money for—if something would happen to" Mr. Elliott. The Appellant said, "'I got you.'"

That same evening, Mr. Elliott persuaded Ms. Stephens to help him obtain crack cocaine from the Appellant. The Appellant went to Ms. Stephens's house, sold Mr. Elliott the crack cocaine, then left. The victims and Ms. Stephens used some of the crack cocaine before the victims left. A couple of hours later, the victims went to Mr. Elliott, Jr.'s house. While there, the victims drank beer, and Mr. Elliott showed his son $2,100 in cash. Before Mr. Elliott left, he called and gave someone directions to his location in Tullahoma, presumably the first of twenty-two calls he had that evening with the Appellant. The victims left Mr. Elliott, Jr.'s house and returned to the Quality Inn shortly before midnight.

Ms. Jones identified Mr. Elliott as the man who bought the drugs from the Appellant on a back road on the evening of October 29. Later that night, she and the Appellant went to the Quality Inn. The Appellant went into a motel room with a gun. While the Appellant was gone, Ms. Jones heard two "pops." When the Appellant returned to the car, he was carrying an item that appeared to be a cellular telephone. During the drive that night, the Appellant threw away the telephone at one location and threw away the gun at a different location. Cellular telephone records confirmed the route that the Appellant and Ms. Jones traveled that night. Additionally, cellular telephone records confirmed that the Appellant and Mr. Elliott spoke several times that night. Mr. Elliott's last telephone conversation with the Appellant was at 12:27 a.m. on October 30.

While in jail, the Appellant confessed to Mr. Whitaker and Mr. Pentecost that he was involved in the murder of two white men in a motel. Further, in response to questions asked by Officer Kennedy, Agent Poff, and Chief Young, he nodded his head, acknowledging his involvement in the murders.

Regarding the conviction of especially aggravated robbery, the Appellant argues that the State failed to prove that anything was taken from the victims, that a deadly weapon was involved, or that the victims suffered serious bodily injury. The testimony at trial revealed that two weeks earlier, the Appellant went to Mr. Elliott's motel room to "hit a lick," which meant to rob Mr. Elliott. Ms. Jones testified that on the night of the crimes, the Appellant went into the victims' motel room with a gun and shortly thereafter, she heard two "pops." The victims died from

27

gunshot wounds to the head. Ms. Stephens and Mr. Elliott, Jr., saw Mr. Elliott with a considerable amount of money earlier in the evening; however, when Mr. Elliott's body was found, he had no money. Ms. Jones saw the Appellant leave the motel room with an object in his hand that she thought was a cellular telephone. The Appellant later disposed of the telephone while they drove toward Chattanooga. The police never found Mr. Elliott's cellular telephone. We conclude that the evidence was sufficient to sustain the Appellant's convictions.

*Wade I*, 2016 WL 1886189 at \*14–16.

The record supports the TCCA's denial of this claim. As the TCCA correctly noted, evidence from cellular phones demonstrated Petitioner's whereabouts on the night of the murders. Additionally, testimony from Timica Jones established that Petitioner had a gun on him when he visited the Tullahoma Quality Inn on the night of the killings. Ms. Jones also notably testified that she heard what were presumably the gunshots that killed the unarmed victims after Petitioner left her in the car at the Tullahoma Quality Inn where the victims were killed.

Additional evidence at the trial demonstrated that when Mr. Tarrant expressed concern about his pending criminal prosecution based on the victims' drug buys as confidential informants soon before the victims were killed, Petitioner reassured Mr. Tarrant that everything would be okay. Also, at that same gathering, Petitioner told his nephew, "I got you," after the nephew stated that "he had money for—if something would happen to" to Victim Elliot. Moreover, two witnesses at Petitioner's trial also testified that Petitioner confessed his role in killing two men in a hotel room to them, and police testified that Petitioner reacted to their statements to him about the events surrounding the victims' deaths in a manner that incriminated him in those murders.

Evidence at Petitioner's trial further showed that Petitioner had previously attempted to rob the victims in their room at the Tullahoma Quality Inn while he was armed. Additionally, while witnesses saw Victim Elliot with a substantial amount of money in the hours before he was killed, Victim Elliot did not have any money on him when police examined his body after his death, and

Ms. Jones testified that Petitioner had a phone in his hand when he returned to the car in the parking lot of the Tullahoma Quality Inn.

Accordingly, viewing the evidence at Petitioner's trial in the light most favorable to the prosecution, it is more than sufficient to support Petitioner's convictions for murder and especially aggravated robbery under Tennessee law. *Pike*, 978 S.W.2d at 914–915; Tenn. Code Ann. §§ 39-13-202(a)(2), § 39-13-403(a)(1) and (2), § 39-13-401(a); § 39-14-103; § 39-11-106(a)(34)(A). As such, Petitioner is not entitled to relief under § 2254 based on this claim.

## V.     CONCLUSION

For the reasons set forth above, Petitioner's petition for § 2254 relief will be **DENIED**, and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas corpus proceeding only if he is issued a COA, and a COA may issue only where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484.

Reasonable jurists could not debate the Court's conclusion that Petitioner procedurally defaulted the ineffective assistance of claims that the Court denied based on that procedural default. Additionally, reasonable jurists could not conclude Petitioner has made a substantial showing of a denial of a constitutional right with regard to any of his claims that the Court addressed on the merits, such that they would be adequate to deserve further review. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be frivolous. Fed. R. App. P. 24.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**


/s/ _____
**CURTIS L.  COLLIER**
**UNITED STATES DISTRICT JUDGE**

30